**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

**STERLING KELLY**, individually, on behalf of all others similarly situated,

Plaintiff,

v.

**TRUE FINANCE LLC**,

Defendant.

Case No. 5:25-CV-01284-MA

**JURY TRIAL DEMANDED**

**AMENDED CLASS ACTION COMPLAINT**

Plaintiff Sterling Kelly, a Specialist in the U.S. Army ("Plaintiff" or "Spc. Kelly"), on behalf of himself and all others similarly situated, alleges the following based upon personal knowledge as to himself and upon information and belief and the investigation of his counsel as to all other matters, and brings this Class Action Complaint against True Finance LLC ("True Finance" or "Defendant"), and alleges as follows:

**NATURE OF THIS ACTION**

1. This Complaint seeks to protect active-duty military servicemembers from True Finance's predatory lending practices that violate the Military Lending Act, 10 U.S.C. § 987, *et seq*. ("MLA"). The MLA was enacted to protect United States active-duty servicemembers and their dependents (collectively, "Covered Members") from predatory lending. Excessive debt endangers our nation's military readiness and is detrimental to service-member retention, morale, household stability, security clearances, and career advancement. Notably here, True Finance makes no effort to fulfill its duty to determine whether it is lending to Covered Members or to

provide legally mandated protections for them.

2. True Finance is in the business of payday lending through an earned wage access ("EWA") product—it makes funds available to its customers, who repay True Finance principal and finance charges (including expedite fees and subscription charges) on or just after payday. Its business model entails making high-frequency, short-term, and high-cost loans to consumers living paycheck to paycheck. Despite advertising its loans as "no interest" and promising no mandatory fees, in practice, True Finance takes in **triple-digit** or **quadruple-digit** finance charges for the loans it issues. True Finance levies its customers with exorbitant finance charges, with APRs for Spc. Kelly as high as **1,091%**. The end result is a financial product that extracts sky-high fees from workers, encourages serial usage and dependance on the costly loans, worsens workers' financial circumstances, and traps them in a cycle of debt.

3. Plaintiff, a Specialist in the U.S. Army, has used True Finance's cash advance product on multiple occasions. By virtue of the sky-high fees charged for early access to his salary, True Finance has extended consumer credit to Plaintiff on numerous occasions in violation of the MLA.

4. Borrowing money that is repaid on payday is not an innovation; it is a loan. As EWA products have become more popular, the parallels to payday lending are striking. Like payday loans, EWA products can trap users in a cycle of reborrowing that increases their financial distress, all in service of generating revenue for predatory lenders. Considering the substance of the transactions, Defendant's cash advance transactions are in reality consumer credit.

5. In violation of the MLA, Defendant uses its cash advance product to saddle Covered Members with charges that, on average, yield a military annual percentage rate ("MAPR") well in excess of the MLA's legal limit.

6. True Finance's consumer credit agreements violate the MLA in at least three ways: by (1) charging interest above the 36% statutory Military Annual Percentage Rate (MAPR) cap; (2) failing to provide required MLA Disclosures; and (3) requiring access to the borrowers' deposit account as security for the loan. 10 U.S.C. § 987(b), (c) & (e)(5).

7. Among the abusive lending practices that the MLA was designed to curb was predatory payday loans made to servicemembers.[1] In a Department of Defense ("DoD") report on predatory lending practices affecting military members (the "Report"), the egregious lending practices prevalent in the payday lending industry were highlighted.[2] The Report noted that payday lenders were "heavily concentrated around military bases," with statistics showing that communities with military installations "rank among the most heavily targeted communities in their respective states."[3] Military populations were targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday loan," with such loans costing servicemembers over $80 million in abusive fees annually as of 2005.[4]

8. True Finance's business practices violate the MLA and are part of a systematic nationwide policy and practice. Spc. Kelly seeks to hold Defendant accountable for its actions and prevent its predatory lending practices from continuing.

## PARTIES

9. Plaintiff is an individual, over 18 years of age. At all times relevant, Spc. Kelly was a natural person and resident of El Paso County, Texas. Spc. Kelly has been an active-duty

---

[1] *Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents*, U.S. DEP'T OF DEFENSE (Aug. 9, 2006), available at https://apps.dtic.mil/sti/pdfs/ADA521462.pdf.
[2] *Id.* at 10–16.
[3] *Id.* at 10–11.
[4] *Id.* at 11.

servicemember in the United States Army since June 2023.

10. Defendant True Finance LLC is a Delaware limited liability company with its principal place of business in Vancouver, Washington. True Finance has offered and entered into loan agreements with consumers, including Covered Members, for many years, entering into at least hundreds of thousands of credit transactions.

## TOLLING OF THE STATUTE OF LIMITATIONS

11. The Servicemember Civil Relief Act ("SCRA"), 50 U.S.C. § 3901, *et seq.*, tolls any and all limitations or repose periods for all active-duty military members, including those similarly situated to Spc. Kelly, until their active-duty service concludes. Specifically, § 3936(a) of the SCRA provides:

> The period of a servicemember's military service may not be included in computing any period limited by law, regulation, or order for the bringing of any action or proceeding in a court, or in any board, bureau, commission, department, or other agency of a State (or political subdivision of a State) or the United States by or against the servicemember or the servicemember's heirs, executors, administrators, or assigns.

## JURISDICTION AND VENUE

12. This court has federal question jurisdiction under 28 U.S.C. § 1331. Plaintiff's Complaint alleges federal claims under the MLA. Under the MLA, "[a]n action for civil liability . . . may be brought in any appropriate United States district court, without regard to the amount in controversy, or in any other court of competent jurisdiction." 10 U.S.C. § 987.

13. Venue is proper in the Western District of Texas because Defendant consented to jurisdiction in the federal and state courts of Bexar County, Texas, in its agreements with Plaintiff and members of the putative class.

14. This Court has jurisdiction over True Finance, because it, at all times relevant herein, conducted business operations in Bexar County, Texas (including making thousands of

loans and debiting and crediting Texas borrowers' bank accounts), and consented to jurisdiction here.

## LEGAL BACKGROUND

### The MLA Was Specifically Designed to Curb Predatory Payday Loans to Covered Members

15. The DoD's Report on lending practices discussed the payday lending industry at length.[5] The Report noted that payday lenders were "heavily concentrated around military bases," with statistics showing that communities with military installations "rank among the most heavily targeted communities in their respective states."[6]

16. Military populations were targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday loan," with such loans costing servicemembers millions in abusive fees.[7] Moreover, the military payment architecture, and the Uniform Code of Military Justice to which servicemembers are bound, make them particularly vulnerable to predatory payday loans:

> Check-holding, a central feature of payday loans, is particularly risky for military borrowers. Every payday loan involves a prospective "bad" check. Military borrowers are required to maintain bank accounts in order to receive direct deposit of military pay and are subject to the Uniform Code of Military Justice that penalizes deliberately writing a check not covered by funds on deposit. Borrowers become trapped in repeat borrowing or renewals of loans in order to keep the check used to obtain the loan from bouncing, a key reason that payday loans are debt traps.[8]

17. While the precise EWA product offering was developed somewhat recently, its genre (small-dollar, short-duration, high-cost loans) is nothing new. In 2006, the DoD noted

---

[5] Report, *supra* note 1.
[6] *Id.* at 10–11.
[7] *Id.* at 11.
[8] *Id.* at 14. To be sure, EWA providers like True Finance do not collect physical checks from their customers at loan initiation, but instead takes a virtual check by requiring Covered Members to authorize automatic debits from bank accounts to repay their loans.

military "borrowers encounter[ed] a booming virtual market of small loan offers, payday loans, and 'military loans' via the Internet."[9] Those loans, like True Finance's, "are delivered and collected online through electronic fund transfer."[10]

18. The Report noted key similarities between the various predatory lending products—including payday loans and internet loans—that target the military, which accurately encapsulate True Finance's business model:

> (1) Predatory lenders seek out young and financially inexperienced borrowers who have bank accounts and steady jobs, but also have little in savings, flawed credit or have hit their credit limit. These borrowers are less likely to weigh the predatory loan against other opportunities and are less likely to be concerned about the consequences of taking the loan.
> (2) Predatory lenders make loans based on access to assets (through checks, bank accounts, car titles, tax refunds, etc.) and guaranteed continued income, but not on the ability of the borrower to repay the loan without experiencing further financial problems.[11]
> (3) . . . Increasingly the Internet is used to promote loans to Servicemembers.
> (4) Predatory products feature high fees/interest rates, with some requiring balloon payments, while others pack excessive charges into the product. The result of their efforts is to obfuscate the comparative cost of their product with other options available to the borrower.
> . . .
> (6) Predatory lenders attempt to work outside of established usury limits, either by attempting to obtain exemptions from federal and state statutes or by developing schemes designed to circumvent existing laws.[12]

19. The Report further found "high interest loans, whether provided as a payday loan, military installment loan, or as a result of unscrupulous automobile financing can leave a servicemember with enormous debt, family problems, difficulty maintaining personal readiness and a tarnished career."[13] As if being trapped in a debt cycle is not bad enough, some

---

[9] *Id.* at 15.
[10] *Id.* at 16.
[11] To that end, lenders' "use of checks, access to bank accounts, [and similar other methods of extracting repayment] pressure the borrow to consider loan payments as being their top priority." *Id.* at 44.
[12] *Id.* at 21–22.
[13] *Id.* at 39.

servicemember victims of payday and other lenders experienced disciplinary action (ranging from reprimands to "loss of promotions and separation from the military") as a result of their financial hardship.[14]

20. Drawing from the bountiful evidence of servicemember abuse at the hands of predatory lenders, the DoD concluded it could not "prevent predatory lending without assistance from Congress, the state legislatures, and federal and state enforcement agencies."[15]

21. To curb usurious interest rates, excessive annual percentage rates (APRs), and bogus fees, the DoD requested legislation that would prevent lenders from preying on servicemembers and endangering the nation's military readiness.[16]

22. The American Bar Association and others expressed support for the DoD's request, noting the urgent need for remedial Congressional action to curb predatory loan practices harming Servicemembers. The legislation requested was supported by the DoD, military and veterans organizations, legal aid organizations, consumer advocacy groups, faith-based organizations, and of course lawmakers.

23. Congress answered the call and passed the MLA to protect Covered Members from unfair, deceptive, and excessively priced loans.

---

[14] *Id.* at 41–42.
[15] *Id.* at 46.
[16] Specifically, the DoD requested legislation protecting servicemembers "from unfair, deceptive lending practices and usurious interest rates and to require uniform disclosure of credit and terms. Specifically, lenders should not be permitted to base loans on prospective bad checks, electronic access to bank accounts, mandatory military allotments, or titles to vehicles. All costs involved in borrowing should be included in interest rate calculations and disclosures. Laws and regulations must be changed to close regulatory loopholes that leave non-resident military borrowers unprotected in many states." *Id.*

## **The Military Lending Act**

24. In the wake of the DoD's investigations, in 2006, Congress enacted the Military Lending Act, 10 U.S.C. § 987, *et seq*.

25. The MLA makes it unlawful for a creditor to "impose an annual percentage rate of interest greater than 36 percent with respect to the consumer credit extended to a Covered Member or a dependent of a Covered Member." 10 U.S.C. § 987(b).

26. The MLA also requires mandatory disclosures in "consumer credit"[17] transactions with Covered Members, which include:

- A statement of the annual percentage rate of interest applicable to the extension of credit, 10 U.S.C. § 987(c)(1)(A);
- Any disclosures required under the Truth in Lending Act, 10 U.S.C. § 987(c)(1)(B); and
- A clear description of the payment obligations of the member or dependent, as applicable, 10 U.S.C. § 987(c)(1)(C).

27. The MLA, too, prohibits creditors from using a "method of access to a deposit, savings, or other financial account maintained by the borrower . . . as security for the obligation[.]" 10 U.S.C. § 987(e)(5).

[17] Under the MLA, consumer credit is defined as "credit offered or extended to a Covered Member primarily for personal, family, or household purposes," subject to a finance charge or payable by written agreement in more than four installments and outside the ambit of any of the identified exceptions.

## FACTS

## The Earned Wage Product Market and True Finance

### EWA Products Charge High Fees and Wreak Havoc on Borrowers' Financial Health

28. A significant driver of demand for consumer credit and financial products stems from the mismatch between when a family receives income and when they pay expenses. Employees generally provide services before being paid for their labor and are typically paid in arrears on a biweekly or semi-monthly cycle. To meet liquidity challenges, consumers have for years turned to credit cards, personal installment loans, and payday loans.

29. Recently, an old product with new packaging—coined "earned wage access" or "earned wage advance" ("EWA")—has been created and offered to consumers to address the same need. While marketed as a novel financial technology ("fintech") device, in practice, EWA products are garden variety cash advances.

30. EWA products provide workers, before their payday, with a portion of their earned but unpaid wages or funds that purport to equal or approximate a portion of their unpaid wages. Loaned funds are repaid via automated withdrawal from the consumer's bank account.

31. Defendant is one such fintech company that provides an EWA service, which it calls simply "Cash Advance." True Finance markets itself as having "a mission to help millions of Americans who need a few dollars in between paydays."

32. To repay these loans, users must link their bank account to their True Finance profile and authorize automated debits from their linked external bank account on the scheduled repayment date.

33. EWA providers advertise their products as "free" or "no interest" while obscuring the ways in which they bilk consumers for fees and other finance charges that add up to loan-shark

rates.

34. True Finance, like its EWA provider competitors, is generally paid through two types of fees: (1) expedite fees, and (2) mandatory subscription charges.

35. First, **expedite fees** are charged to provide instant access to loan funds (or, in True Finance's words, to receive a "Rapid Advance"). For Rapid Advances, True Finance charges between $3.99 and $7.99 (less for smaller loans; more for larger loans). Just like with traditional credit products, borrowers must pay larger fees to access larger loans.

36. True Finance discloses the following fee table breaking down its fees in its Terms and Conditions:

We do not charge a fee for ACH transfers. We do charge a fee for Rapid Advance, which is based size of the advance:

- $10 - $15: $1.99 fee
- $15.01 - $35.00: $2.99 fee
- $35.01 - $65.00: $3.99 fee
- $65.01 - $119.99: $6.99 fee
- $120.00+: $7.99 fee

If you choose to receive an "Rapid" Advance, the respective fee will be debited at the time you repay the advance. Note that TrueFinance cannot control when your bank will make an ACH transfer or Rapid Advance available to you.

37. The speed of access to funds is an essential and defining aspect of EWA products. They are designed to address—and marketed as addressing—what is generally a less-than two-week liquidity problem.

38. True Finance's website, app, and marketing advertise instant or same-day access to hundreds of dollars of cash advances. For example, True Finance advertisements include representations such as:

- "Wallet feeling light? Access to up to $100 cash advance."

- “Access up to $100 in cash the same day.”
- “Take cash now. Repay from your next paycheck.”
- “Funds can arrive in minutes.”

39. In its advertisements for instant cash, True Finance does not include information about the $2.99–$5.99 Rapid Advance fees necessary to receive loan funds instantly. Instead, users who respond to True Finance’s advertising and download the app are not presented with meaningful, prominent disclosures of the Rapid Advance fees until they have already connected their bank account, signed up for a monthly subscription service, and begun the process of requesting a cash advance.

40. While expedite fees are notionally optional and users can use an EWA product without paying one, they are difficult to access and negate their usefulness to consumers. For instance, True Finance tells its customers that its free, non-expedited version of an advance will take “1-2 business days” to receive, while the expedited service takes just a few minutes. This delay is problematic for True Finance’s intended users, consumers living paycheck to paycheck who turn to EWA providers for the precise reason that their need for cash is urgent and cannot wait.

41. Consumers who cannot wait for days to access their wages certainly will pay whatever fees an EWA provider charges to obtain their funds as quickly as possible. As a result, the vast majority of EWA users pay expedite fees to obtain immediate funds disbursement.[18]

---

[18] One recent survey found 79% of EWA users typically paid expedite fees to receive funds faster. Lucia Constantine, Christelle Bamona, Sara Weiss, *Not Free: The Large Hidden Costs of Small-Dollar Loans Made Through Cash Advance Apps*, CTR. FOR RESPONSIBLE LENDING, at 3 (Apr. 2024). Likewise, the Consumer Financial Protection Bureau found 96% of fees paid by consumers using employer-integrated EWA providers were for expedite fees. Consumer Financial Protection Bureau, Data Spotlight: Developments in the Paycheck Advance Market (July 18, 2024),

42. Turning to the second type of fee, **subscription charges** are monthly fees True Finance charges its users to connect their deposit accounts, which is a mandatory condition for receiving Cash Advances.

43. True Finance forces users signing up to its service through its app to agree to a monthly subscription to gain access to Cash Advances. Below are the screens True Finance shows users while signing up for Cash Advances through the app:




*Figure 1*




*Figure 2*

---

https://www.consumerfinance.gov/data-research/research-reports/data-spotlight-developments-in-the-paycheck-advance-market/.

44. Subscription charges are presented to users as mandatory fees that must be paid to use the platform and access Cash Advances. There is no mechanism available through True Finance's app to sign up for Cash Advances without agreeing to $4.99 monthly subscription charges.

45. True Finance notes on its website for its Cash Advance product, "Approval not guaranteed." Therefore, not everyone will qualify for a Cash Advance. And for those who qualify, the majority are offered much less than the $100 maximum advertised by True Finance.

46. Cash Advance offers range from $10–$100. However, few True Finance subscribers are offered amounts near the top end of this range.

47. When properly viewing EWA products' expedite fees and subscription fees as costs of credit (*i.e.*, finance charges), the annual percentage rates (APR) for these loans are eye-popping.

48. A recent study found the average APR imposed by EWA providers is 334%, in line with payday loans:




*Figure 3*

49. True Finance positions itself as a lower-cost option for borrowers in need of quick cash, emphasizing on its website that for its Cash Advance there is "No interest. No credit check.

No hidden fees." Likewise, on an FAQ page on its website, True Finance boasts: "At True Finance, we don't believe in unnecessary fees or profiting from financial hardship."

50. In truth, True Finance is a wolf in sheep's clothing: extending loans with APRs *exceeding* the exorbitantly-priced payday loan products it claims to replace.

51. The EWA "business model capitalizes on most borrowers' financial precarity, and the user interface of these products makes paying a fee . . . difficult to avoid."[19] For True Finance, fees are impossible to avoid, since users have to pay a $4.99 monthly subscription to be eligible for a Cash Advance and True Finance makes more money on Rapid Advance fees on the vast majority of Cash Advance loans extended to its customers.

52. The end result is a product that traps consumers in cycles of debt, worsens their financial circumstances, leads to more overdraft fees, and an ever-increasing reliance on emergency funds from—and the fees that come with—EWA loans.

53. A Center for Responsible Lending ("CRL") analysis found consumers who used EWA products took out advances repeatedly, with many taking advances on the same day or the day after repayment and were consequently more likely to overdraft their accounts and be forced to pay overdraft fees. Specifically, the CRL found that 27% of EWA users take out at least 25 loan advances a year, and for 33% of users, the vast majority (80%) of their borrowing is followed by reborrowing within two weeks.[20] This suggests receiving a reduced paycheck (*i.e.*, reduced to pay back EWA loans and fees) necessitated taking out more advances in the following pay period.

---

[19] Candice Wang, Lucia Constantine, Monica Burks, Yasmin Farahi, *A Loan Shark In Your Pocket: The Perils of Earned Wage Advance*, CTR. FOR RESPONSIBLE LENDING, at 7 (Oct. 2024) (hereinafter "*Loan Shark*").

[20] *Loan Shark*, *supra* note 19, at 7.

54. Another CRL study found that using EWA products is closely correlated with overdraft fees. "Overdrafts on consumers' checking accounts increased 56% on average after use of an advance product."[21]

**EWA Providers Utilize Strict Underwriting Procedures and, Consequently, Almost Always Collect**

55. While EWA products are financially disastrous for customers, EWA products have proven profitable for the companies offering them. They maximize profits by using exacting underwriting procedures that ensure cash advances, and the fees that accompany them, are timely repaid through automated bank account debits that borrowers authorize when taking out the loans.

56. Not everyone who creates a True Finance account and pays subscription fees will qualify for a Cash Advance. To be eligible for a Cash Advance, borrowers must meet minimum qualifications set by True Finance.

57. To determine whether a borrower is creditworthy and decide how much credit to extend in the first place, True Finance requires users to connect their accounts to True Finance through a third-party service called Plaid.[22] Plaid partners with True Finance and other fintech companies to allow them to view data in customers' accounts. Plaid allows True Finance to "[q]uickly verify assets and income" of True Finance users, providing "real-time insights into a borrower's income and employment in seconds with a breakdown of earnings from salaries, gig work, and more."[23]

58. True Finance uses its real-time insight into customer accounts to ensure borrowers will have sufficient funds to repay their loans on payday and schedule debits on or immediately

---

[21] *Not Free*, *supra* note 18, at 6.

[22] Users signing up for a True Finance account through the app are shown a screen directing the user to link their bank account.

[23] *Plaid Solutions: Credit*, PLAID.COM, https://plaid.com/solutions/credit/ (last visited Mar. 23, 2025).

after payday following any given loan, ensuring their loans are paid as soon as funds become available.

59. True Finance's underwriting process is detailed and considers many factors. True Finance continually adjusts eligibility and maximum withdrawal amounts depending on the individual's borrowing history and financial health (as gleaned through Plaid). In determining how much credit to extend, True Finance assesses "your anticipated income, transaction history, and information about your Linked Accounts and accounts."

60. Qualifying for a cash advance is by no means guaranteed. True Finance notes that its Cash Advances are offered only to "eligible" subscribers. During the class period, many users who created a True Finance account, provided all the information (including sensitive demographic information and bank account access) requested, *and* signed up to pay and paid subscription fees were deemed by True Finance unqualified for a Cash Advance.

61. That is, after reviewing borrowers' financials, True Finance determines many of its paying customers are not credit worthy and declines to offer them Cash Advance access.

62. For borrowers who qualify, True Finance strictly monitors their financial health to determine whether they are eligible and, if so, how much credit to extend based on borrowers' default risk and ability to repay.

63. Through its constant underwriting process, True Finance extends loans to borrowers only when it is confident they will repay.

64. Borrowers obtain greater access to credit—*i.e.*, True Finance raises their maximum loan limit—by consistently paying off loans to True Finance on time and generally improving their financial health (which True Finance monitors through the borrowers' bank balance, spending behavior, repayment history, and income).

65. These underwriting methodologies—extending credit only to those who will repay, and only in amounts that are likely to be repaid—are precisely the same methods used by traditional credit issuers, like banks. "US credit card lenders individualize interest rates and credit limits according to assessments of customers' default risk."[24]

66. In addition to these loan qualification procedures, borrowers must link their bank account (that receives a consistent source of directly deposited income) to their True Finance profile to ensure seamless repayment.

67. During the cash advance request process, True Finance "automatically" selects the borrowers' "repayment date" as the borrower's "next payday." According to an FAQ on True Finance's website, "your recurring income date sets your settlement date" for cash advance repayments.[25]

68. When applying for a Cash Advance, borrowers must authorize Defendant to automatically debit their loan repayment from their linked debit card. To do so, borrowers are required to agree to the "payment authorization" and confirm that the "Repay amount" is "Due on" the repayment date (*i.e.*, the borrower's next payday) and will be settled via "Auto Repay." It

[24] Matcham, *Risk-Based Borrowing Limits in Credit Card Markets* (Mar. 10, 2015), https://willmatcham.com/img/main_rbbl_matcham_2024_08_15.pdf; *see also* Dey, Mumy, *Determinants of Borrowing Limits on Credit Cards*, FED. RESERVE BANK OF BOSTON (2006), ("Publicly available information about borrowers' creditworthiness helps banks sort their client pool into broad risk classes by way of their credit scoring systems. . . . Profit-maximizing banks choose to provide exactly the amount of credit to their borrowers that maximize their expected profits."), https://www.bostonfed.org/-/media/Documents/events/payment-choice/papers/Dey.pdf; *What are credit limits?*, ARMED FORCES BANK (Apr. 4, 2024) ("Financial institutions grant credit limits that allow you to use credit . . . while ensuring you can manage your payments."), https://www.afbank.com/article/what-are-credit-limits-and-how-are-they-determined.

[25] *Cash Advance Eligibility*, TRUE, https://intercom.help/truefinance/en/articles/6661677-cash-advance-eligibility (last visited Oct. 18, 2025).

is impossible for a borrower to obtain Defendant's Cash Advances without pre-authorizing a repayment debit.

69. Borrowers must further agree that "If authorized payment is (i) returned by your financial institution, (ii) declined due to sufficient [sic] funds in your Linked Account, or (iii) otherwise unable to be processed on the Repayment Date, we will reattempt your repayment up to 180 days after a failed repayment attempt, on subsequent dates at our discretion."

70. True Finance reinforces that borrowers owe a debt. For example, Defendant shows borrowers who have taken an advance, screens in the app indicating that they have an amount that is "due" and will be paid by "Auto Repay" on the repayment date as the exemplar screenshot below reflects:




*Figure 4*

71. Further, in an FAQ about direct deposit, True Finance states that borrowers must have direct deposit so "You can pay back your advance." Likewise, when an advance is outstanding, the True Finance app includes a statement on the homepage that: "Your cash advance is set to be repaid on [the repayment date]."

72. Failure to pay back a Cash Advance loan results in losing eligibility for "further Cash Advance[s] or access to certain PFM Services while any amounts owed for Cash Advance remain unpaid."

73. In sum, True Finance's underwriting process requires, before any money changes hands, that borrowers: (1) demonstrate they receive regular, consistent income (2) in an amount sufficient to cover existing obligations *and* a Cash Advance; (3) link the bank account to which direct deposits are received to True Finance's app through Plaid; (4) authorize True Finance to automatically debit the linked accounts on or around the borrower's payday in an amount that is equal to the cash advance the borrower receives (the principal loan amount) plus fees; (5) be current on all prior Cash Advance loans; and (6) be current on all True Finance subscription fees. Borrowers who fail to complete these steps cannot obtain cash advances.

74. Through these underwriting procedures and policies, True Finance ensures it will be able to automatically deduct the sum of the cash-advance loan amount (the loan principal), plus any additional charges, from the linked account as soon as the borrower's next payday is deposited.

75. What's more, Defendant does not provide a means to cancel repayment through the app. According to True Finance's Terms and Conditions, cancellation requires a user to notify True Finance at least three business days before the original scheduled debit date by contacting support, and "[i]f your request is received later than that, True Finance may attempt to cancel the transaction but is not obligated to do so."

76. These debt collection methods are so successful that EWA lenders recoup their advances at least 97% of the time using these tactics.[26]

[26] Devina Khanna and Arjun Kaushal, *Earned Wage Access and Direct-to-Consumer Advance Usage Trends*, Fin. Health Network (April 2021) at 2, available at https://cfsi-innovation-files-

**True Finance's Loans to Plaintiff**

77. Spc. Kelly is currently an active-duty member of the United States Army stationed at Fort Bliss in El Paso, Texas.

78. He has been an active duty servicemember since June of 2023 and will remain on active duty until at least January of 2028.

79. True Finance extended consumer credit to Plaintiff in the form of Cash Advance transactions like those discussed above.

80. Plaintiff used the loans from True Finance for personal, family, or household purposes.

81. Plaintiff paid True Finance's finance charges, in the form of Rapid Advance fees and subscription charges, to obtain cash-advance loans from True Finance.

82. A small selection of Cash Advance loans made by True Finance to Plaintiff (and accompanying Rapid Advance fees) are shown in the below table, with the cost of credit and APR included:[27]

| Date | Principal Amt. | Rapid Advance Fees | Loan Period | APR |
|---|---|---|---|---|
| 11/09/24 – 11/13/24 | $25.00 | $2.99 | 4 days | 1,091% |
| 11/23/24 – 11/26/24 | $35.00 | $2.99 | 3 days | 1,039% |
| 12/01/24 – 12/11/24 | $45.00 | $3.99 | 10 days | 324% |

2018.s3.amazonaws.com/wp-content/uploads/2021/04/26190749/EWA_D2C_Advance-_sage_Trends_FINAL.pdf.

[27] These APR calculations are solely demonstrative and do not include the subscription fees which must be included in the military APR calculation pursuant to 32 C.F.R. § 232.4(c)(1)(iii)(C).

83. Spc. Kelly has received dozens of usurious loans from True Finance since he started using the service. For much of the relevant period, Spc. Kelly took out a loan each pay period and was forced to take out *another loan* immediately after repayment of his last loan.

84. Spc. Kelly has paid monthly subscription fees throughout the relevant period to be a True Finance Premium subscriber.

85. The fees attendant to Defendant's loans (including, *inter alia*, Rapid Advance fees and subscription charges) are immediately and directly connected to True Finance's extensions of credit to Plaintiff.

86. Further, True Finance's credit agreement required Spc. Kelly to provide access to a deposit account and to preauthorize payment from that account, as security for True Finance's extension of each payday loan, in violation of 10 U.S.C. § 987(e)(5). True Finance's credit agreement also failed to include mandatory MLA loan disclosures in violation of 10 U.S.C. § 987(c).

## CLASS ACTION ALLEGATIONS

87. Plaintiff brings this class action on behalf of himself and all other persons similarly situated. The proposed Class is defined as follows:

> All Covered Members to whom True Finance extended a "Cash Advance" (or substantially similar) product, in which the borrower incurred a finance charge (including, without limitation, a Rapid Advance fee or subscription charge).

88. Expressly excluded from the Class are: (a) any Judge presiding over this action and members of their families; (b) True Finance and any entity in which True Finance has a controlling interest, or which has a controlling interest in True Finance, and its legal representatives, assigns and successors; and (c) all persons who properly execute and file a timely request for exclusion from the Class.

89. Spc. Kelly reserves the right to amend the Class definition if further investigation and discovery indicates that the Class definition should be narrowed, expanded, or otherwise modified.

**Numerosity and Ascertainability**

90. Plaintiff is unable to state the precise number of members of the class because such information is in the exclusive control of True Finance. True Finance's scheme has harmed and continues to harm the members of the Class. The members of the proposed Class are so numerous that joinder of all members is impracticable. True Finance has made millions of loans, and Spc. Kelly estimates there are at least many thousands of consumers in the Class. Thus members of the Class are so numerous that joining them in a single action is impracticable. The exact size of the proposed class, and the identity of the members thereof, will be readily ascertainable from the business records of True Finance.

91. The disposition of the claims of these Class members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in True Finance's possession, custody, or control.

**Commonality**

92. There are common questions of law and fact affecting the rights of each Class member and common relief by way of damages. The harm that True Finance has caused or could cause is substantially uniform with respect to Class members. Common questions of law and fact that affect the Class members include, but are not limited to:

- Whether Spc. Kelly and the Class members are Covered Members subject to the protections and limitations of the MLA;
- Whether True Finance is a "creditor" subject to the protections and limitations of

the MLA;

- Whether True Finance's loans constitute an extension of "consumer credit" subject to the protections and limitations of the MLA;
- Whether True Finance entered into standard form loan agreements with Covered Members;
- Whether True Finance's loans exceed the MLA statutory rate cap of 36% MAPR;
- Whether True Finance failed to provide required credit disclosures in violation of the MLA;
- Whether True Finance required access to Covered Members' deposit accounts as security for its payday loans in violation of the MLA;
- Whether Class members are entitled to actual or statutory damages for the aforementioned violations and, if so, in what amounts;
- Whether True Finance should be enjoined from continuing its lending practices in the manner challenged herein;
- Whether True Finance is subject to punitive damages, and, if so, the proper measure of such damages and remedies to which Spc. Kelly and the Class are entitled under 10 U.S.C. § 987(f)(5); and
- Whether Class Members are entitled to declaratory or injunctive relief.

**Typicality**

93. The claims and defenses of Spc. Kelly are typical of the claims and defenses of the MLA Class because Spc. Kelly is a Covered Member and loan agreements with True Finance are typical of the type of personal, household, or family loans that True Finance normally provides to Covered Members. Additionally, True Finance uses the same or substantially similar standard

form loan agreement in all of its lending transactions. The documents involved in the transaction were standard form documents and the violations are statutory in nature. Spc. Kelly suffered damages of the same type and in the same manner as the Class he seeks to represent. There is nothing peculiar about Plaintiff's claims. Plaintiff has no interests antagonistic to the interests of the other members of the Class.

**Adequate Representation**

94. Spc. Kelly will fairly and adequately assert and protect the interests of the Class. Spc. Kelly has hired attorneys who are experienced in prosecuting class action claims and will adequately represent the interests of the Class, and Spc. Kelly has no conflict of interest that will interfere with maintenance of this class action.

95. Plaintiff and his counsel are committed to vigorously prosecuting the action on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor his counsel have interests adverse to those of the Class.

**Predominance and Superiority**

96. The common questions of law and fact set forth herein predominate over any questions affecting only individual Class members. A class action provides a fair and efficient method for the adjudication of this controversy for the following reasons which is superior to the alternative methods involved in individual litigation:

- The Class is so numerous as to make joinder impracticable. However, the Class is not so numerous as to create manageability problems. There are no unusual legal or factual issues that would create manageability problems. Prosecution of separate actions by individual members of the Class would create a risk of inconsistent and varying adjudications against Defendant when confronted with incompatible

standards of conduct;

- Adjudications with respect to individual members of the Class could, as a practical matter, be dispositive of any interest of other members not parties to such adjudications, or substantially impair their ability to protect their interests; and
- The claims of the individual Class members are small in relation to the expenses of individual litigation, making a Class action the only procedural method of redress in which Class members can, as a practical matter, recover.

97. The proposed Class fulfills the certification criteria of Federal Rule of Civil Procedure 23.

**CAUSE OF ACTION**
**(Violations of the Military Lending Act, 10 U.S.C. § 987, *et seq.*)**
**(On Behalf of Plaintiff and the Class)**

98. Plaintiff re-alleges and incorporates by reference herein the allegations set forth in the paragraphs 1–97 above.

99. The MLA prohibits a creditor from obligating a "Covered Member" or dependent of a Covered Member (collectively, "Covered Members") to a loan in excess of 36% MAPR.

100. A "Covered Member" in the statute is a "member of the armed forces who is on active duty under a call or order that does not specify a period of 30 days or less."

101. "The MAPR is the cost of the consumer credit expressed as an annual rate." 32 C.F.R. § 232.3. The MAPR includes as relevant here, "finance charges associated with the consumer credit" and "[a]ny fee imposed for participation in any plan or arrangement for consumer credit." 32 C.F.R. § 232.4.

102. Spc. Kelly and the MLA Class Members are "Covered Members," subject to the protections and limitations imposed by the MLA. A Covered Member is a consumer who, at the

time the consumer becomes obligated on a consumer credit transaction or establishes an account for consumer credit, is a Covered Member of the armed forces or a dependent of a Covered Member (as defined in 32 CFR 232.3(g)(2) and (g)(3)).

103. Spc. Kelly is a "Covered Member" with respect to his True Finance loan agreements because Spc. Kelly is an active duty servicemember who is obligated by law to repay loans he took out for personal, family or household purposes.

104. True Finance is a "creditor" subject to the requirements and limitations imposed by the MLA in that it engages in the business of extending consumer credit to Covered Members protected by the MLA. 10 U.S.C. § 987(i)(5); also 32 C.F.R. § 232.3(i).

105. The underlying loan transactions at issue in this case constitute "consumer credit" subject to the protections and limitations imposed by the MLA because they are "credit offered or extended to a Covered Member primarily for personal, family, or household purposes," subject to a finance charge and outside the ambit of any of the identified exceptions. 32 C.F.R. § 232.3(f)(1)(i); also 10 U.S.C. § 987(i)(6).

106. True Finance extended consumer credit to Spc. Kelly and the MLA Class that included interest well above the MLA's 36% interest rate cap.

107. True Finance fails to make all the disclosures required by 10 U.S.C. § 987(c)(1)(A) and 32 C.F.R. § 232.6 in its standard form loan agreements, in violation of the MLA.

108. True Finance's standard form Loan Agreements require the borrower to provide access to a deposit account as security for the payday loan in violation of 10 U.S.C. § 987(e)(5).

109. Accordingly, pursuant to 10 U.S.C. § 987(f)(5), on behalf of the Class, Plaintiff seeks an order from the Court awarding statutory damages in the amount of $500 per violation, actual and punitive damages, along with injunctive relief pursuant to 10 U.S.C. § 987(f)(5)(A).

110. Plaintiff is entitled to an award of attorneys' fees and costs pursuant to 10 U.S.C. § 987(f)(5)(B).

## PRAYER FOR RELIEF

WHEREFORE, on behalf of the Class, Plaintiff prays for judgment against True Finance as follows:

a. That the Court determine that this action may be litigated as a class action and that Plaintiff and his counsel be appointed class representative and class counsel, respectively;

b. That the Court enter judgment against True Finance and in favor of Plaintiff and the Class on all counts;

c. That the Court find and declare that Spc. Kelly and MLA Class Members' standard form loan agreements violate the MLA;

d. That the Court find and declare that True Finance violated the MLA and award Spc. Kelly and Class Members actual damages of not less than $500 per violation pursuant to 10 U.S.C. § 987(f)(5)(A)(i);

e. That the Court award Spc. Kelly and Class Members punitive damages pursuant to 10 U.S.C. § 987(f)(5)(A)(ii);

f. That the Court enjoin True Finance from continuing to engage in predatory lending practices in violation of the MLA;

g. That the Court enjoin True Finance from collecting Class Members' outstanding Cash Advances that violate the MLA;

h. That True Finance be required by this Court's Order to pay a reasonable attorneys' fee to Plaintiff's and costs of suit, and that True Finance be ordered to bear the cost

of notice to the absent Class Members, as well as the administration of any common fund;

i. That the Court award interest as allowable by law; and

j. That the Court award such other and further relief as the Court may deem just and proper.

Dated: March 16, 2026

Respectfully submitted,

*/s/Joshua R. Jacobson*
Joshua Jacobson (admitted *pro hac vice*)
**JACOBSON PHILLIPS, PLLC**
2277 Lee Road, Ste. B
Winter Park, FL 32789
Phone: (321) 447-6461
Email: joshua@jacobsonphillips.com

Bart Dalton (TX Bar Number: 24043418)
Katarzyna Brozynski (TX Bar Number: 24036277)
**BROZYNSKI & DALTON PC**
5700 Tennyson Parkway, Suite 300
Plano, Texas 75024
Tel: +1 (972) 371-0679
bart@bdlegalgroup.com

Lee Lowther (admitted *pro hac vice*)
Randall K. Pulliam (admitted *pro hac vice*)
Courtney Ross Brown (admitted *pro hac vice*)
**CARNEY BATES & PULLIAM, PLLC**
One Allied Drive, Suite 1400
Little Rock, AR 72207
Phone: (501) 312-8500
Email: llowther@cbplaw.com
Email: cbrown@cbplaw.com
Email: rpulliam@cbplaw.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I, Joshua Jacobson, hereby certify that on this 16th day of March, 2026, I electronically filed the foregoing via the Court's CM/ECF system, which will provide electronic notification to all counsel of record.

*/s/ Joshua R. Jacobson*
Joshua Jacobson